1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EVERETT LEE GHOLSTON,

                    Petitioner,

          v.

RON BARNES, Warden,

                    Respondent.

Case No. EDCV 13-283-DDP(JC)

SUPERSEDING REPORT AND
RECOMMENDATION OF UNITED
STATES MAGISTRATE JUDGE

     This Superseding Report and Recommendation is submitted to the
Honorable Dean D. Pregerson, United States District Judge, pursuant to the
provisions of 28 U.S.C. § 636 and General Order 05-07 of the United States
District Court for the Central District of California.

**I.     SUMMARY**

     On February 13, 2013, Everett Lee Gholston ("petitioner"), a state prisoner
proceeding with counsel, filed a Petition for Writ of Habeas Corpus by a Person in
State Custody ("Petition") pursuant to 28 U.S.C. § 2254.  Petitioner challenges a
judgment in Riverside County Superior Court on the following grounds:  (1) his
trial counsel was ineffective in several respects (Grounds One through Three);
///

1

1    (2) the trial court erred by denying petitioner's <u>Wheeler/Batson</u>[1] motion (Ground

2    Four); and (3) there was insufficient evidence to support the gang enhancements.

3    (Ground Five).[2]

4    ///

5    ///

6

7    _____

8    [1]<u>See</u> <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986) (purposeful discrimination in the jury

     selection process violates the Equal Protection Clause of the Fourteenth Amendment).  <u>People v.</u>

9    <u>Wheeler</u>, 22 Cal.3d 258 (1978), is the California equivalent of <u>Batson</u>.  <u>See</u> <u>Paulino v. Harrison</u>,

     542 F.3d 692, 695 n.1 (9th Cir. 2008).

10

11   [2]Although all of the claims in the Petition are exhausted, petitioner, on March 1, 2013,

     filed a request to stay this action and to hold the proceedings in abeyance pending his exhaustion

12   of additional claims ("proposed new claims") in the California courts ("Stay Request").  On

     October 30, 2013, this Court issued an order denying the Stay Request without prejudice (Docket

13   No. 20 ("October 2013 Order")) because, as detailed therein, the proposed new claims – which

     were then pending in a habeas petition in the California Supreme Court in Case No. S214197–

14   already appeared to be time-barred, petitioner did not appear to be entitled to equitable tolling,

     the proposed new claims did not appear to relate back to the date of the filing of the Petition, and

15   petitioner had not demonstrated good cause for his failure to exhaust the proposed new claims

     earlier.  (October 2013 Order) (analyzing the Stay Request under both <u>Kelly v. Small</u>, 315 F.3d

16   1063 (9th Cir. 2003) and <u>Rhines v. Weber</u>, 544 U.S. 269 (2005)).  However, the October 2013

     Order expressly stated that it was without prejudice, that it was based on the then current record,

17   and that nothing therein precluded petitioner from seeking leave to file an amended petition upon

     exhaustion of the proposed new claims if this action was then still open and pending and if

18   petitioner could demonstrate that the proposed new claims arose from the same core of operative

     facts as the exhausted claims in the Petition such that they related back to the filing date of the

19   Petition and were rendered timely.  (October 2013 Order at 10 n.4).  Although the publicly

     available docket for California Supreme Court Case No. S214197 (http://appellatecases.

20   courtinfo.ca.gov), of which this Court takes judicial notice, reflects that such court denied

     petitioner's state habeas petition on March 12, 2014, with citations to <u>In re Robbins</u>, 18 Cal. 4th

21   770, 780 (1998) and <u>In re Clark</u>, 5 Cal. 4th 750, 767-69 (1993), signifying that it was rejected as

     untimely and piecemeal/successive (<u>see</u> <u>Thorson v. Palmer</u>, 479 F.3d 643, 645 (9th Cir. 2007)

22   and <u>Clark</u>, 5 Cal. 4th at 767-69), petitioner has not sought to amend the Petition to include the

     proposed new claims.  In light of <u>Bastidas v. Chappell</u>, ___ F.3d ___, 2015 WL 3972942 (9th Cir.

23   July 1, 2015), which held that a magistrate judge was without authority to deny a stay request in

     analogous circumstances, this Court attaches and incorporates into this Report and

24   Recommendation by reference, its October 2013 Order and converts it into a recommendation

     that the District Judge deny the Stay Request – a recommendation as to which the parties may

25   object within twenty (20) days of the issuance of this Report and Recommendation.

26

27

28

1       On June 12, 2013, respondent filed an Answer and a supporting

2   memorandum ("Answer").[3]  On January 21, 2014, petitioner filed a Traverse

3   ("Traverse") and exhibits ("Traverse Ex.").

4       For the reasons stated below, the Petition should be denied, and this action

5   should be dismissed with prejudice.[4]

6   **II.   PROCEDURAL HISTORY**

7       On October 15, 2008, a Riverside County Superior Court jury found

8   petitioner guilty of three counts of assault with a firearm, one count of shooting at

9   an inhabited dwelling, and one count of attempted murder.  (CT 1231-44).  The

10   jury also found true allegations that petitioner personally used a firearm and that

11   the crimes were committed for the benefit of a criminal street gang.  (CT 1232,

12   1235, 1238, 1240, 1243-44).  The trial court sentenced petitioner to a total of 30

13   years to life in state prison.  (CT 1374-77).

14       On February 18, 2011, the California Court of Appeal affirmed the

15   judgment in a reasoned decision.  (Lodged Doc. 5).  On June 8, 2011, the

16   California Supreme Court denied review without comment.  (Lodged Doc. 7).

17       Petitioner thereafter sought, and was denied habeas relief in the Riverside

18   Superior Court, the California Court of Appeal, and the California Supreme Court.

19   (Lodged Docs. 8-15).

20   **III.   FACTS**

21       Since petitioner raises a sufficiency of the evidence claim, the Court has

22   independently reviewed the state court record (see Jones v. Wood, 114 F.3d 1002,

23

24   _____

25       [3]Respondent concurrently lodged multiple documents ("Lodged Doc."), including the
Clerk's Transcript ("CT") and the Reporter's Transcript ("RT").  Respondent also lodged

26   missing pages of the Reporter's Transcript on June 10, 2015.

27       [4]One of petitioner's co-defendant – Jerry Adams, Jr. ("Adams") – also has a Petition for
Writ of Habeas Corpus pending in this Court in the case entitled:  Adams v. Swartout, EDCV 13-

28   124-MMM(JC).

1008 (9th Cir. 1997)), and based thereon adopts the following factual summary from the California Court of Appeal's opinion on direct review (replacing petitioner's name with "petitioner") as a fair and accurate summary of the evidence presented at trial. (Lodged Doc. 5 at 3-6).

Around noon on October 7, 2004, 16-year-old Lamar Lee and Anthony M. were in the garage of a house owned by the Young family on Sweeney Drive in Moreno Valley.  Their friend Felton Young III was in the backyard of the house. The garage door was open, and Lee and Anthony M. watched as a car drove by and fired two guns at the garage.  Lee and Anthony M. told the police that the shooters were petitioner and Adams and that they believed Correyon Jefferson was also in the car.

Young's father, Felton Young, Jr., often referred to as "Pops,"[5] arrived home shortly after the shooting.  Lee and Anthony M. told Pops that petitioner and Adams shot at them.  Pops was familiar with petitioner and Adams, as his sons were friends with them, and Pops had started a competitive hip hop dance group called Cali Clowns, in which petitioner had participated.

Around 2:30 p.m., two vehicles headed out from the Young family's house to look for the perpetrators of the drive-by shooting.  Pops drove a Mercedes with two passengers.  Young drove a van with Anthony M. among his passengers. Nearby at Pattilynn Drive, in front of Moreno Valley High School, they located a group of people including petitioner and Jefferson.  Adams was not present.

Pops exited his car and questioned petitioner and Jefferson about the drive-by shooting.  When the occupants of the van joined the confrontation, tensions escalated.  Several members of the group that included petitioner and Jefferson pulled out guns and started shooting.  Anthony M. was shot in his buttocks, with

---

[5]For the sake of clarity, the Court refers to Felton Young, Jr., as "Pops" and Felton Young III as "Young."

the bullet exiting his left hip.  Young was shot in the back near the top of his tailbone.  According to Pops's testimony, immediately after being shot Young identified petitioner as his shooter, and Anthony M. identified Jefferson as his shooter.  A few days after the shooting, Young told the police that five different people were shooting at them, petitioner shot him, and Jefferson shot Anthony M.

A shell casing from a .45 caliber gun found at the scene of the Sweeney Drive shooting matched shell casings found at the scene of the Pattilynn Drive shooting.

A second amended information charged crimes arising out of the Sweeney Drive shooting and the Pattilynn Drive shooting.  For the Sweeney Drive shooting, Adams, Jefferson, and petitioner were charged in counts 1 and 2 with the attempted murder of Lee and Anthony M., and in count 3 with shooting at an inhabited dwelling.  For the Pattilynn Drive shooting, petitioner and Jefferson were charged with the attempted murder of Young and Anthony M. in counts 4 and 5.  Count 6 charged Adams with active participation in a criminal street gang, but that charge was later dismissed by the prosecutor during trial.  The second amended information also contained gang and firearm allegations in counts 1 through 5.

The case proceeded to a jury trial at which the defendants were Adams, Jefferson, petitioner, and Jacob Allen Rogers.[6]  The jury heard an expert testify that the defendants were associates of the Sex Cash Money (Sex Cash) gang at the time of the shootings, but they were not confirmed members.  Adams presented an alibi defense through witnesses who testified that he was at home when the Sweeney Drive shooting occurred.

///

---

[6]Rogers was alleged in counts 4 and 5 to have committed attempted murder during the Pattilynn Drive shooting.  The jury returned guilty verdicts as to Rogers, convicting him of lesser included offenses in counts 4 and 5.

On counts 1 and 2, the jury convicted Adams and petitioner of the lesser included offense of assault with a firearm, and on count 3 convicted Adams and petitioner of shooting at an inhabited dwelling.  It also found true the allegations on counts 1, 2 and 3 that Adams and petitioner committed the crimes for the benefit or, at the direction of, or in association with a criminal street gang, and on count 3 that Adams and petitioner personally used a firearm.  The jury acquitted Jefferson on counts 1 through 3.

On count 4, the jury convicted Jefferson of the attempted murder of Anthony M. and convicted petitioner of the lesser included offense of assault with a firearm on Anthony M.  On count 5, the jury convicted petitioner of the attempted murder of Young and convicted Jefferson of the lesser included offense of assault with a firearm on Young.  On counts 4 and 5, the jury made a true finding on the allegation that Jefferson and petitioner committed the crimes for the benefit or, at the direction of, or in association with a criminal street gang, and with respect to the attempted murder conviction in counts 4 and 5, it made true findings on the firearm allegations.

## IV.   STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A federal court may not grant an application for writ of habeas corpus on behalf of a person in state custody with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim:  (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a

///

///

decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).[7]

In applying the foregoing standards, federal courts look to the last reasoned state court decision.  See Smith v. Hedgpeth, 706 F.3d 1099, 1102 (9th Cir.), cert. denied, 133 S. Ct. 1831 (2013).  "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) (cited with approval in Johnson v. Williams, 133 S. Ct. 1088, 1094 n.1 (2013)); Cannedy v. Adams, 706 F.3d 1148, 1158 (9th Cir. 2013) (it remains Ninth Circuit practice to "look through" summary denials of discretionary review to the last reasoned state-court decision), as amended on denial of rehearing, 733 F.3d 794 (9th Cir. 2013), cert. denied, 134 S. Ct. 1001 (2014).

However, to the extent no such reasoned opinion exists, courts must conduct an independent review of the record to determine whether the state court clearly erred in its application of controlling federal law, and consequently, whether the state court's decision was objectively unreasonable.  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000), abrogated on other grounds, Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003); see also Harrington v. Richter, 562 U.S. 86, 98 (2011) ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."); Cullen v. Pinholster, 131 S. Ct. 1388, 1402 (2011) ///

---

[7]When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.  Harrington v. Richter, 562 U.S. 86, 99 (2011); see also Johnson v. Williams, 133 S. Ct. 1088, 1094-96 (2013) (extending Richter presumption to situations in which state court opinion addresses some, but not all, of defendant's claims).

("Section 2254(d) applies even where there has been a summary denial.") (citation omitted).

When it is unclear whether deference under the foregoing standards applies, federal habeas courts can deny writs of habeas corpus under Section 2254 by engaging in a *de novo* review.  Berghuis v. Thompkins, 560 U.S. 370, 390 (2010). When it is clear that the state court has not decided an issue on the merits, or when a state court's adjudication of a claim on the merits results in a decision contrary to or involving an unreasonable application of clearly established federal law or is based on an unreasonable determination of the facts, review is also *de novo*.  See Cone v. Bell, 556 U.S. 449, 472 (2009); Panetti v. Quarterman, 551 U.S. 930, 953 (2007); Hurles v. Ryan, 752 F.3d 768, 778 (9th Cir.), cert. denied, 135 S. Ct. 710 (2014).

## V.    DISCUSSION[8]

Petitioner claims he is entitled to federal habeas relief because of ineffective assistance of counsel, trial court error, and insufficiency of the evidence to support the jury's true finding on the gang enhancement allegations.  Petitioner is not entitled to habeas relief on any of his claims.

### A.    Petitioner's Ineffective Assistance of Trial Counsel Claims Do Not Merit Federal Habeas Relief

Petitioner contends that his trial counsel was ineffective for:  (1) failing to object to the exclusion of Leshawn Lewis's statement given to police after Lewis refused to testify at trial (Petition, Ground One); and (2) failing to present Reginald Alexander and Travon Ford as witnesses at trial (Petition, Grounds Two and Three).  Petitioner maintains that Lewis and Alexander (who allegedly were in the van with Young before the Pattilynn Drive shooting began) would have

---

[8]The Court has read, considered and rejected on the merits all of petitioner's contentions. The Court discusses petitioner's principal contentions herein.

1   testified that they did not see petitioner shoot a gun during the Pattilynn Drive

2   shooting.  (Traverse at 18-23; Traverse Ex. A (post-trial declarations from Lewis

3   and Alexander)).  Ford assertedly would have testified that he witnessed the

4   shooting and that it was Keymonnie Rander who shot a .45 caliber gun.  (Traverse

5   Ex. A (post-trial declaration from Ford and police report of Ford's interview)).  As

6   discussed below, the state court denials of these claims were not unreasonable.

7               **1.    Applicable Law**

8          The Sixth Amendment to the United States Constitution, as applied to the

9   states through the Fourteenth Amendment, guarantees a criminal defendant the

10   effective assistance of counsel at trial.  Evitts v. Lucey, 469 U.S. 387, 392 (1985).

11   To warrant habeas relief, a petitioner must demonstrate both that:  (1) counsel's

12   performance was deficient; and (2) the deficient performance prejudiced his

13   defense.  Strickland v. Washington, 466 U.S. 668, 687-93 (1984).  Deficient

14   performance is prejudicial only if "there is a reasonable probability that, but for

15   counsel's unprofessional errors, the result of the proceeding would have been

16   different."  Id. at 694.  The probability that the verdict would have been different

17   must be "substantial."  Richter, 562 U.S. at 112 (citing id. at 693).  That is, the

18   criminal proceedings must have been rendered "fundamentally unfair" by attorney

19   error such that "the trial cannot be relied on as having produced a just result."

20   Strickland, 466 U.S. at 686, 700.

21          As both prongs of the Strickland test must be satisfied to establish a

22   constitutional violation, failure to satisfy either prong requires that an ineffective

23   assistance claim be denied.  See Strickland, 466 U.S. at 697 (no need to address

24   deficiency of performance if prejudice is examined first and found lacking); Hein

25   v. Sullivan, 601 F.3d 897, 918 (9th Cir. 2010) (a court can deny a Strickland claim

26   if either part of the test is not satisfied), cert. denied, 131 S. Ct. 2093 (2011).

27          Where, as here, there has been a state court decision rejecting a Strickland

28   claim, review is "doubly deferential."  Richter, 562 U.S. at 105 (citing Knowles v.

9

1    Mirzayance, 556 U.S. 111, 123-24 (2009)); 28 U.S.C. § 2254(d).  A state court's

2    decision rejecting a Strickland claim is entitled to "a deference and latitude that

3    are not in operation when the case involves review under the Strickland standard

4    itself."  Richter, 562 U.S. at 101; see also Padilla v. Kentucky, 559 U.S. 356, 372

5    (2010) (noting, "There is no reason to doubt that lower courts – now quite

6    experienced with applying Strickland – can effectively and efficiently use its

7    framework to separate specious claims from those with substantial merit.").  "The

8    pivotal question is whether the state court's application of the Strickland standard

9    was unreasonable.  Richter, 562 U.S. at 101; 28 U.S.C. § 2254(d).  "[E]ven a

10   strong case for relief does not mean the state court's contrary conclusion was

11   unreasonable."  Richter, 562 U.S. at 102 (citing Lockyer v. Andrade, 538 U.S. 63,

12   75 (2003)).  The range of reasonable Strickland applications is "substantial."

13   Richter, 562 U.S. at 105 (citing Mirzayance, 556 U.S. at 123).

14                    **2.    Counsel Was Not Ineffective for Failing to Object to the**

15                            **Exclusion of Lewis's Statement to the Police**

16          Petitioner argues here as he did on direct appeal that his trial counsel was

17   ineffective for failing to object at trial on due process grounds to the exclusion of

18   Leshawn Lewis's statement to the police.  (Petition, Ground One; Traverse at 18-

19   21).[9]  The police had interviewed a person who identified himself as Deondrae

20   Lewis (Leshawn Lewis's older brother) as part of their investigation of the

21   shootings.  See CT 910-35 (transcript of interview).  Petitioner's counsel learned

22   that the foregoing statement likely was actually given by Leshawn (not his

23   brother) and called Leshawn to testify at trial, but Leshawn asserted his Fifth

24   Amendment rights and refused to answer any questions concerning the shootings.

25   (RT 1480-87).  The trial court found Lewis's potential testimony "essential and

26   _____

27          [9]Respondent asserts that Ground One is unexhausted (Answer at 5-6), but a review of the
     California Supreme Court pleadings shows that this claim has been presented to such court.

28   (Lodged Docs. 6, 12).

1   important" to petitioner's defense in that Lewis reportedly said he did not see

2   petitioner with a gun, and granted Lewis immunity to testify.  (RT 1678-84).

3   Lewis still refused to testify and was found in contempt.  (RT 1684-90).  Counsel

4   then sought to have Lewis's recorded statement admitted in evidence but the trial

5   court denied the request on hearsay grounds.  (RT 1691-92).  Counsel made no

6   objection to the court's ruling.  (RT 1692).

7        In the interview, Lewis (who the Court assumes, *arguendo,* was Leshawn

8   Lewis) told police that he knew petitioner from school.  (CT 919).  Lewis went

9   with Young and others to Pattilynn Drive looking for the people who had shot at

10   Young's house earlier in the day.  (CT 912-18).  Lewis saw petitioner in a group

11   of nine or ten guys.  (CT 918-19).  The police asked Lewis if petitioner had a gun

12   or pulled a gun out.  (CT 920).  Lewis answered, "I don't know.  I was running."

13   (CT 920).  Police pressed Lewis, "So you didn't see [petitioner] with a gun?" and

14   Lewis answered, "No, I know I seen [sic] a white boy with a gun.  It [sic] was like

15   three or four that had a gun."  (CT 920).  Later in the interview, the police again

16   asked Lewis if he saw petitioner with a gun, and Lewis answered, "Nah.  I didn't

17   . . . I done. . . all I seen [sic] was the white dude because I remember him."  (CT

18   926).  However, Lewis volunteered, "I think Everett did shoot too because Everett

19   shot at the house this morning," based on Lewis having been told that petitioner

20   had shot at the house.  (CT 928-29).  Lewis explained that he and the Youngs

21   knew petitioner and had been friends with petitioner but that ended when

22   petitioner started gang banging.  (CT 929, 931-32).

23        The California Court of Appeal issued the last reasoned decision denying

24   Ground One on the merits, finding that petitioner had not established a reasonable

25   probability of a different result had counsel successfully argued for the admission

26   of Lewis's statement to police.  (Lodged Doc. 5 at 27-28).  The Court explained:

27              Lewis's statement was not strongly exculpatory of [petitioner].

28       Although Lewis stated to police that he did not see [petitioner] with a

gun at Pattilynn Drive, the entire context of his statement reveals that this was because he was busy running away and was not looking at [petitioner].  Lewis never stated to the police that he saw [petitioner] and that [petitioner] did not have a gun.  Indeed, as part of his statement, Lewis stated that he believed that [petitioner] was one of the shooters at Pattilynn Drive because [petitioner] had been identified as a shooter at Sweeney Drive.  Had Lewis's statement been admitted at trial, the jury would have been left with the impression that Lewis simply did not know from his *own* observation whether [petitioner] had a gun at Pattilynn Drive.

Further, the other evidence that [petitioner] had a gun at Pattilynn Drive was strong and would have negated Lewis's relatively weak statement that he did not see [petitioner] with a gun.  Young told Pops and the police that he saw [petitioner] pull a gun out of his backpack and shoot him, and Pops saw [petitioner] with a .45 or .44 caliber gun at Pattilynn Drive.  Further, shell casings from the same .45 caliber gun that was fired at Sweeney Drive by either [petitioner] or Adams were found at Pattilynn Drive, where only [petitioner], and not Adams, was present.

(Lodged Doc. 5 at 27-28 (emphasis original)).  This was not unreasonable.

Assuming, *arguendo*, that trial counsel was ineffective for failing to object to the exclusion of Lewis's recorded statement on due process grounds, petitioner has not shown prejudice.  Lewis stated that he believed three or four people had guns during the Pattilynn Drive shooting, tying one gun to the "white boy" (or Jacob Rodgers),[10] and leaving the rest unaccounted for.  (CT 920, 926).  Lewis

---

[10]Police interviewed Jacob Rodgers on the day of the shooting and Rodgers admitted that he was one of the Pattilynn Drive shooters.  (CT 521, 524, 533-34, 538, 545-47).  Rodgers

(continued...)

also volunteered that he thought petitioner was one of the shooters.  (CT 928-29).[11]
 Had Lewis's statement been presented to the jury, there is no reasonable
probability, much less a substantial probability, that the result of the proceeding
would have been different.  Strickland, 466 U.S. at 694; Richter, 562 U.S. at 112
(the probability that the verdict would have been different must be "substantial")
(citation omitted).  If anything, the statement arguably would have strengthened
the prosecution's case against petitioner because the jury likely would have heard
Lewis's statement that petitioner was a gang banger during the time of the
shooting.

For these reasons, the state courts' rejection of Ground One was not
contrary to, or an unreasonable application of clearly established federal law.  Nor
was it based on an unreasonable determination of the facts in light of the evidence
presented.  Accordingly, petitioner is not entitled to federal habeas relief on this
basis.

### 3.      Counsel Was Not Ineffective for Failing to Present Reginald Alexander and Travon Ford in Petitioner's Defense

Petitioner faults counsel for failing to present Pattilynn Drive eyewitnesses
Alexander and Ford who assertedly would have testified that they did not see

---

[10](...continued)
claimed not to know who else shot during the incident.  (CT 510, 524-26, 533, 538).  Rodgers
knew petitioner but claimed that he did not see petitioner at the time of the Pattilynn Drive
shooting.  (CT 533).  Rodgers later admitted that petitioner was there and told police that
petitioner had told Rodgers to put Rodgers' gun away.  (CT 534, 537, 544).  Rodgers did not tell
police that petitioner did not have a gun and did not shoot.  (CT 500-48).  In a post-trial
declaration from 2012, Rodgers claims that petitioner did not have a gun or shoot at anyone
during the incident.   (Traverse, Ex. A (declaration)).

[11]While Lewis provided three post-trial declarations indicating that he did not see
petitioner with a gun during the Pattilynn Drive shooting, these declarations are irrelevant to the
court's consideration of whether petitioner was prejudiced by the exclusion of his recorded
statement to police, which was all trial counsel had available for petitioner's defense during trial.
See Traverse, Ex. A (declarations from 2009, 2012, and 2013).

petitioner with a gun.  (Petition, Grounds Two and Three; Traverse at 20-23).
Petitioner raised these claims in his state habeas petitions filed with the California
Court of Appeal, which issued the last reasoned decision denying these claims.
See Lodged Docs. 8-15; see also Dockets in In re Gholston, Cal. Ct. App. Case
No. D063880, Cal. S. Ct. Case No. S214197 (available online at
http://appellatecases.courtinfo.ca.gov) (dockets for petitioner's second round of
state habeas petitions).  Petitioner provided declarations from Alexander and Ford
with his state habeas petitions.  (Id.; Traverse, Ex. A (copies of declarations)).  In a
declaration dated December 23, 2011, Alexander states that he was with the
Youngs when they located petitioner and Jefferson on Pattilynn Drive.  (Traverse,
Ex. A).  Pops was talking to petitioner about the Sweeney Drive shooting when a
fight broke out and shots were fired.  Alexander noticed two "dudes" backing up
and shooting, and they were not petitioner or Jefferson.  Alexander states that
neither petitioner nor Jefferson had any weapons or backpacks.  Alexander states
that a defense investigator contacted him and he told the investigator to subpoena
him for trial and he would testify to these facts.  Alexander, who was in jail at the
time of petitioner's trial, was never called as a witnesses or contacted by any of the
defense attorneys.  (Traverse, Ex. A).

In a declaration dated January 5, 2012, Ford states that he witnessed the
Pattilynn Drive shooting and made a statement to police near the time of the
shooting which is contained in a police report attached to the declaration.
(Traverse, Ex. A).  Ford states that he saw Keymonnie (Rander) with a blue steel
.45 caliber handgun and "believes" Rander shot more than five rounds.  Ford
states that he had seen Rander with the gun two weeks prior to the shooting.
(Traverse, Ex. A).  Ford states he was available to testify at petitioner's trial.
(Traverse, Ex. A).

The Court of Appeal issued the last reasoned opinions rejecting petitioner's
claims that counsel was ineffective for failing to present Alexander and Ford for

1  failure to show that he would have achieved a more favorable result at trial had

2  these witnesses been presented to the jury.  (Lodged Doc. 11; see also Docket in In

3  re Gholston, Cal. Ct. App. Case No. D063880 (Sept. 23, 2013 entry for the order

4  denying petition)).  This was not unreasonable.

5       Courts assessing the reasonableness of an attorney's decisions begin with

6  the presumption that "counsel's conduct falls within the wide range of reasonable

7  professional assistance." Strickland, 466 U.S. at 689, 691.  The presumption that

8  counsel's performance was objectively reasonable is particularly strong with

9  respect to decisions regarding witness selection. See Lord v. Wood, 184 F.3d

10  1083, 1095 (9th Cir. 1995) ("Few decisions a lawyer makes draw so heavily on

11  professional judgment as whether or not to proffer a witness at trial."), cert.

12  denied, 528 U.S. 1198 (2000); see also United States v. Harden, 846 F.2d 1229,

13  1232 (9th Cir.) (an attorney's decision not to call a witness constitutes a matter of

14  trial tactics which habeas court should not second guess), cert. denied, 488 U.S.

15  910 (1988).  A petitioner may overcome this presumption by demonstrating that

16  counsel failed to call a witness who would have significantly corroborated a

17  chosen defense strategy, and did so without a reasonable tactical justification. See

18  Alcala v. Woodford, 334 F.3d 862, 870-71 (9th Cir. 2003) (applying pre-AEDPA

19  standard of review; finding presentation of alibi defense "plainly deficient"

20  because counsel could not state why key defense witness had not been called at

21  trial).  Even so, a habeas petitioner must still demonstrate that counsel's deficient

22  performance was prejudicial.  In assessing whether a petitioner has established

23  prejudice, courts consider:  (1) whether the witness was available to testify; (2) the

24  substance of the witness's anticipated testimony; and (3) whether the witness's

25  testimony created a reasonable probability that the result of the proceeding would

26  have been different. See, e.g., Alcala, 334 F.3d at 872-73.  Here, petitioner has not

27  so demonstrated.

28  ///

15

1    First, petitioner's counsel reasonably could have chosen not to call

2  Alexander and Ford to testify at trial because they would not have provided

3  helpful testimony.  At the time of trial, like Lewis, Alexander was in custody on

4  other charges and may have refused to testify.  (Traverse, Ex. A (Alexander

5  declaration and superior court record)).  While Alexander has provided a

6  declaration indicating that he did not see petitioner with a weapon during the

7  Pattilynn Drive shooting, and he allegedly told defense counsel's investigator as

8  much prior to trial, the declaration is from 2011.  There is no credible indication

9  that Alexander, who was a friend of the Youngs and went to Pattilynn Drive with

10  the Youngs, would have testified contrary to the Youngs' testimony that petitioner

11  shot Young at the time of trial, if at all.  Indeed, petitioner's trial counsel indicated

12  in a letter to appellate counsel that after a diligent search no such favorable

13  evidence (as that described in these proceedings) was available to counsel for trial.

14  (Traverse Ex. B (letter)).  If Alexander would have testified, he may have helped

15  the prosecution's case by testifying about why the Youngs tracked down petitioner

16  in the first place, *i.e.*, their belief that petitioner committed the Sweeney Drive

17  shooting.

18    In Ford's interview with police (as summarized in the police report – which

19  Ford does not dispute), Ford reportedly said that he, petitioner, and others

20  belonged to the Sex Cash gang.  (Traverse Ex. A (police report)).  Ford also

21  reportedly told the police that he had gone to Pattilynn Drive to confront petitioner

22  about the shooting that occurred earlier in the day on Sweeney Drive.  (Traverse

23  Ex. A (police report)).  While Ford reported seeing Rander with a gun, neither the

24  report nor the declaration indicates whether Ford saw petitioner with a gun.

25  ((Traverse Ex. A (Ford declaration and police report)).  Ford reported that he

26  believed there were other people shooting due to hearing multiple gunshots going

27  off at one time; however, Ford was running away from the location when the

28  shooting began and did not see the shots.  (Traverse Ex. A (police report)).

Assuming Ford would have testified at trial, counsel reasonably could have chosen not to present Ford as a witness because Ford could have testified affirmatively that petitioner was a member of the Sex Cash gang at the time of the shootings, that Ford went to confront petitioner for the Sweeney Drive shootings, and that Ford did not see the shots fired.

Considering the evidence tying petitioner to the Pattilynn Drive shooting (namely, testimony from Pops and Young that petitioner shot Young), fairminded jurists could conclude that there was no reasonable probability of a different result at petitioner's trial had counsel presented Alexander's and Ford's testimony about what they saw on the day of the shooting. Strickland, 466 U.S. at 697; Richter, 526 U.S. at 101, 112. Petitioner's is not a case where the witness testimony not presented was so certain or so crucial as to undermine the Court's confidence in the outcome at trial.[12]

_____

[12]While petitioner provided this Court and the state courts with post-trial declarations from Young, Pops, and Rander, wherein Young and Pops indicate that they never saw petitioner with a gun at Pattilynn Drive and Rander indicates that it was Rander who shot Young, not petitioner (see Lodged Docs. 10, 13, 14; Docket in In re Gholston, Cal. Ct. App. Case No. D063880), the Court of Appeal questioned the credibility of these declarations, noting that percipient witnesses in gang-involved shootings often change their version of events over time. See Lodged Doc. 11; Docket in In re Gholston, Ct. App. Case No. D063880 (Sept. 23, 2013 entry for the order denying petition). These declarations are not particularly persuasive.

First, the jury heard Young's testimony which was consistent with his post-trial declarations. Young testified that he did not remember if petitioner or Jefferson were at the Pattilynn Drive location, he did not remember seeing anyone with a gun, and did not remember telling the police about it. (RT 536, 541, 567-71, 575, 595-98). Young was hit with one shot in the buttock during the Pattilyn Drive shooting but did not think that petitioner was the one who shot him. (RT 543-44, 599, 644-45).

Second, Pops's trial testimony was unequivocal: Pops testified that he saw Rogers shooting but saw no other shots fired on Pattilynn Drive. (RT 738-39, 742, 747, 840). Pops testified that he saw petitioner and Jefferson carrying pistols as they walked away with others. (RT 739-48, 777, 841-42, 853-54). Petitioner passed his gun to a girl and kept walking away. (RT 743). Young had been shot and told Pops that petitioner had shot him. (RT 753-55, 763,

(continued...)

1     For these reasons, the Court of Appeal's rejection of Grounds Two and

2  Three was not contrary to, and did not involve an unreasonable application of

3  clearly established federal law, and was not based on an unreasonable

4  determination of the facts.  Accordingly, petitioner is not entitled to habeas relief

5  on this basis.

6     **B.     The Trial Court's Denial of Petitioner's <u>Wheeler/Batson</u> Motion**

7          **Does Not Merit Habeas Relief (Ground Four)**

8     In Ground Four, petitioner asserts that the trial court violated petitioner's

9  right to a fair trial by an impartial jury by denying petitioner's <u>Wheeler/Batson</u>

10  motion.  (Petition, Ground Four; Traverse at 23-30).  The California Court of

11  Appeal issued the last reasoned decision denying petitioner's claim on the merits,

12  finding that the prosecution's reasons for striking the jurors at issue were

13  reasonable and had a basis in accepted trial strategy, and that substantial evidence

14  supported the trial court's conclusion that the prosecutor's stated race-neutral

15  reasons for striking the jurors were credible.  (Lodged Doc. 5 at 12-24).  This

16  finding was not unreasonable.

17     **1.     Applicable  Law: The <u>Batson</u> Framework**

18     In <u>Batson v. Kentucky</u>, 476 U.S. 79, 86 (1986), the Supreme Court held that

19  "[t]he Equal Protection Clause guarantees the defendant that the State will not

20  exclude members of his race from the jury venire on account of race."  A trial

21

22  _____

23     [12](...continued)
   781, 855).  In his 2013 declaration, Pops, who wrote a letter to the trial court seeking leniency in

24  sentencing petitioner noting his own forgiveness of petitioner (CT 1297), claims that his trial
   testimony "was not accurate."  (Traverse, Ex. A (declaration)).  Pops's declaration is not

25  convincing.

26
   Finally, Rander's post-trial declaration that petitioner was not a shooter is not particularly

27  convincing given that Rander was also convicted for the Pattilynn Drive shooting.  (Traverse, Ex.
   A (declaration and Rander's trial court sentencing minutes)), and Rander has no potential adverse

28  consequence for exonerating petitioner.

1  court faced with a Batson challenge undertakes a three-step analysis to determine

2  whether the State has improperly excluded members from the jury.  Snyder v.

3  Louisiana, 552 U.S. 472, 476-77 (2008).  First, the defendant must make out a

4  prima facie case showing that a peremptory challenge has been exercised on the

5  basis of race.  Id. at 476 (citation and quotation marks omitted).  Second, if that

6  showing has been made, the prosecution must offer a race-neutral basis for

7  striking the juror in question.  Id. at 476-77 (citation and quotation marks

8  omitted).  Third, in light of the parties' submissions, the trial court must determine

9  whether the defendant has shown purposeful discrimination.  Id. at 477 (citation

10  and quotation marks omitted).  "[T]he ultimate burden of persuasion regarding

11  racial motivation rests with, and never shifts from, the opponent of the strike."

12  Purkett v. Elem, 514 U.S. 765, 768 (1995); see generally United States v. Alvarez-

13  Ulloa, 784 F.3d 558, 565-67 (9th Cir. 2015), Gonzalez v. Brown, 585 F.3d 1202,

14  1206-09 (9th Cir. 2009), and Paulino v. Harrison, 542 F.3d 692, 699-703 (9th Cir.

15  2008) (discussing Batson analysis).

16       With this basic framework in mind, this Court turns to each of the Batson

17  steps in light of the record at trial.

18       **2.     The State Court Record of Petitioner's Voir Dire**

19            **Proceedings**

20       Voir dire in petitioner's case took place over two court days and involved

21  two panels of potential jurors from which 65 jurors were questioned.  (Lodged

22  Doc. 2A at 11-370).[13]  The trial court conducted voir dire by seating 18

23  prospective jurors from the jury pool at a time and having those jurors answer a

24

25       [13]There were approximately 75 jurors in each panel.  (Lodged Doc. 2A at 11, 174).  From
   the first jury panel, the court excused 40 jurors for language issues, scheduling problems, or for

26  hardship, leaving approximately 35 jurors for questioning.  (Lodged Doc. 2A at 11-58).  From
   the second jury panel, the trial court excused 27 jurors for language issues or scheduling

27  problems, leaving approximately 48 jurors for questioning.  (Lodged Doc. 2A at 174-201).  The
   record does not contain information about the racial makeup of either the jury pool or the jurors

28  who were questioned.

questionnaire.  The attorneys were then permitted to question the jurors individually before making challenges for cause and then, after ruling on the for-cause challenges, the attorneys could exercise their peremptory challenges.  When the parties exhausted their challenges for the 18 seated and questioned jurors, new jurors were called from jury pool to fill open seats and those jurors were questioned by the court and counsel then subject to challenge.  This process continued until the prosecution and defense accepted 12 jurors and three alternate jurors.  (Lodged Doc. 2A at 11-370).

During voir dire, Juror No. 1 (E.H.)[14] said that her father had been incarcerated from 1996 until he passed away in 2004.  (Lodged Doc. 2A at 59). E.H. agreed that her father had been "treated fairly by the system," and had no anger toward the police, court, or lawyers – her father had said it was his choice to commit his crime and the consequences were his.  (Lodged Doc. 2A at 59-60). The prosecutor asked E.H. about a tattoo on the back of E.H.'s ear, which E.H. explained was her son's birth sign.  (Lodged Doc. 2A at 124).  The prosecutor exercised her third peremptory challenge to exclude E.H.  (Lodged Doc. 2A at 168).

Later, in questioning a group of jurors prior to exercising challenges, the prosecutor asked the jurors if they had heard of circumstantial evidence and gave a bank robbery example, then asked the jurors if they would be comfortable with convicting on the basis of circumstantial evidence.  (Lodged Doc. 2A at 287-88). The prosecutor explained:

> Circumstantial evidence they said this person who the police caught three blocks from the bank was wearing similar clothes.  They were just down the street.  They were holding a bag of money in their hands that came from that bank, but that witness inside can't

---

[14]The Court herein refers to the jurors by their seat number or initials.

1    positively say that is the person.  But those little pieces of evidence
2    build up to say that you guys could come to the decision that person
3    was the one that did it. . . .  So even though you don't have somebody
4    specifically saying that person right there is the one, all those little
5    pieces of evidence when they're put together they show beyond a
6    reasonable doubt in your mind that that is the person.  That is just as
7    good as if somebody actually saw the person, or could identify the
8    person.  That is what the law says.  ¶  Is everybody comfortable with
9    that?

10   (Lodged Doc. 2A at 288).  The prosecutor noted that Juror No. 16 (P.B.) gave a
11   "little bit of a grimace" in reply and asked what that meant, leading to the
12   following exchange:

13        [P.B.]:  That could be a false witness.  I don't think so, simply
14   because the bank robbers were running through [the] neighborhood
15   where lots of people are dressing the same and dropped their money,
16   and a kid happened to pick it up and policeman [sic] drive up on them
17   [sic], we see it happens all the time.

18        [Prosecutor]:  That's fair.  That would be your prerogative
19   when you're back there.  But could you see evidence like that can be
20   used[?]  You don't have to have somebody physically actually see the
21   person do it, because there is [sic] a lot of situations.  Say a person's
22   house gets robbed or burglarized.  ¶ Very rarely do victims of that
23   crime see the person that actually broke into their house.  They come
24   home, their house has been broken into, their items are stolen.  So
25   they don't actually see the person who did it.  But say that person is
26   caught down the street holding a ring that looks just like the person's
27   in the house.  They say, well, I walked by, but it wasn't me.  Those
28   little bits and pieces can be used to say he was the one.  He had that

21

1   evidence in his hand.  He was walking by the neighborhood.  If you

2   feel that is enough, that can be used.  ¶ Can you see that situation

3   where you could use other evidence beside [sic] actually direct

4   evidence?

5            [P.B.]:  Yes.

6            [Prosecutor]:  Do you feel comfortable with that?

7            [P.B.]:  No, I disagree with you.  No, simply because there

8   should still be some facts, I think to it.  I mean after all again if the

9   kid is running through the neighborhood and happened to stumble

10  upon those things.  And if the person in the bank says, well, he was 6-

11  5, and this kid they just happen to pick up is only 5-10.  You have to

12  have more facts, I think.

13           [Prosecutor]:  That's a good point.

14                                    * * *

15           [Prosecutor]:  A lot of people aren't very good about height;

16  would you agree, [P.B.]?

17           [P.B.]:  I agree.

18           [Prosecutor]:  Because a little discrepancy like that doesn't

19  necessarily mean that the crime didn't happen; right?  Would you

20  agree, [P.B.]?

21           [P.B.]:  I agree.

22           [Prosecutor]:  So, [P.B.], I just want to be clear, are you saying

23  unless somebody specifically saw the person do it with their own eyes

24  that that would be the only evidence that you would be able to

25  accept?

26           [P.B.]:  Well, along with the facts.  You have fingerprints, and

27  you got to have something in concrete in that area when you are

28  identifying them.  I mean you just can't assume anything.

                                      22

1          [Prosecutor]:  So the circumstantial evidence, that type of

2   evidence you don't think that would be enough even if that is all I

3   have, that is all I got is that circumstantial evidence?

4          The Court:  Well, it depends on what it is counsel.  I think he is

5   saying it depends on how much it is, how you weigh it, how credible

6   it is, whatever.  And to tell him you got to find him guilty because

7   there is some circumstantial evidence I think is an unfair inference to

8   expect him to agree to.  I think we have belabored this issue enough.

9   Let's move on.

10  (Lodged Doc. 2A at 288-91).

11         After the prosecution exercised its ninth peremptory challenge to remove

12  Juror P.B. from the jury, defense counsel made a Wheeler/Batson motion arguing

13  that the prosecution struck two jurors on the basis of race – specifically two

14  African American jurors – Jurors E.H. and P.B.  (Lodged Doc. 2A at 294-99).

15  Counsel acknowledged that E.H. had some family issues regarding her father's

16  incarceration, but argued that everyone has some issues and E.H. said she could be

17  fair no matter what.  (Lodged Doc. 2A at 294-95).  As for P.B., counsel argued

18  that he said he could be fair and the prosecutor's "convoluted" questions to P.B.

19  were not a reason to excuse P.B.  (Lodged Doc. 2A at 295).  Counsel suggested

20  that the prosecutor focused the majority of her voir dire on P.B. to develop a basis

21  for challenging him.  (Lodged Doc. 2A at 295).

22         The trial court found that counsel had made a prima facie showing for the

23  Batson inquiry and required the prosecution to explain the reasons for striking

24  these jurors.  (Lodged Doc. 2A at 295-96).  The prosecutor explained that she

25  asked E.H. specifically about the tattoo behind her ear and noted that no matter

26  what the race, if prospective juror has a visible tattoo she will challenge the juror

27  ///

28  ///

because the tattoo is "something outside of societal norm." (Lodged Doc. 2A at 296).[15]   Additionally, the prosecutor struck E.H. because of her father's conviction, explaining that she strikes all potential jurors who have a family member "arrested recently," because of their "close ties to the system." (Lodged Doc. 2A at 296).  For example, the prosecutor had struck Juror No. 6 (W.A.), who was a pastor and a white man, in part because he had a brother who was incarcerated on multiple occasions.  (Lodged Doc. 2A at 296).[16]   The prosecutor indicated that she intended to strike every prospective juror with a family member who has had negative contact with law enforcement, stating that she planned to challenge Juror No. 8 (S.S.) who was arrested, but she planned on keeping Juror No. 7 (TJ7) who was a black female and whose husband had been arrested over 20 years ago because the prosecutor did not believe that the experience would affect Juror No. 7.  (Lodged Doc. 2A at 297).[17]   The prosecutor also intended to strike

---

[15]It appears that the prosecutor did not strike one juror who had a tattoo on his neck, Juror No. 8 (TJ8). (RT 808).  When defense counsel pointed out for the record the Juror No. 8 had a tattoo on the back of his neck, the prosecutor stated that she did not notice the tattoo prior to it being pointed out after trial was well under way; the juror had been wearing a collared shirt up to that point.  (RT 808).

[16]The trial court found this reason for kicking Juror W.A. not credible, noting that the court thought the prosecutor struck Juror W.A. because he is a pastor and "soft hearted." (Lodged Doc. 2A at 296).

[17]After the prosecutor accepted the panel of 12 jurors and prior to choosing the alternates, defense counsel pointed out that the prosecutor had said she wanted to challenge a juror (Juror S.S.) who was not challenged. (Lodged Doc. 2A at 315-17).  The prosecutor said she forgot and asked the court to reopen voir dire so she could challenge that juror. (Lodged Doc. 2A at 317).  The court declined to reopen voir dire for the 12 seated jurors. (Lodged Doc. 2A at 317).  Later in the proceedings, before any alternate jurors were chosen, Juror No. 9 (R.P.) informed the court that she had various issues that might affect her ability to serve and the prosecutor proposed that the court reopen peremptories and begin with jury selection again on the 12 seated jurors. (Lodged Doc. 2A at 333-38).  The court excused for cause Juror No. 9 and reopened the parties peremptory challenges as to the first 12 seated jurors. (Lodged Doc. 2A at 340).  When given the opportunity, the prosecution used a peremptory challenge to excuse Juror No. 8 (S.S.). (Lodged Doc. 2A at 342).

1   another unidentified panelist with visible tattoos all over his body.  (Lodged Doc.

2   2A at 299).

3       For Juror P.B., the prosecutor said that she struck him because she felt he

4   would have a hard time with the concept of circumstantial evidence.  (Lodged

5   Doc. 2A at 297).  P.B.'s answers to the prosecutor's questions suggested that he

6   would not be able to vote guilty unless there was some kind of concrete evidence

7   like the person who actually saw a crime.  (Lodged Doc. 2A at 297).  As for her

8   attention to P.B., the prosecutor explained that she planned to challenge other

9   jurors who were then available for questioning, *i.e.*, Juror Nos. 17 (E.W.) and 18

10  (B.S.), so she did not need to question those jurors.  (Lodged Doc. 2A at 297-98).

11      The trial court expressed concern about both of the prosecution's

12  challenges, in that the court would have made a different judgment as to P.B. (who

13  seemed to the court to be a critical thinker) and to E.H. given the widespread

14  occurrence of tattoos in society.  (Lodged Doc. 2A at 298-99).  Nonetheless, the

15  judge noted that the issue was not whether the trial court would make decisions

16  different than the prosecutor but rather the prosecutor's credibility.  (Lodged Doc.

17  2A at 299).  Given the way the prosecutor had managed the case and the decisions

18  she had made, her explanations, tone and demeanor, the trial court denied the

19  Wheeler/Batson motion, finding the prosecutor credible and that she had made her

20  decisions for reasons other than racial bias.  (Lodged Doc. 2A at 299).

21          **3.     Petitioner's <u>Batson</u> Step One Showing**

22      At step one of the <u>Batson</u> analysis a prima facie case of discrimination can

23  be made out by "offering a wide variety of evidence, so long as the sum of the

24  proffered facts give 'rise to an inference of discriminatory purpose.'"  Johnson v.

25  California, 545 U.S. 162, 169 (2005) (quoting Batson, 476 U.S. at 94).  A

26  defendant may establish a prima facie case "solely on evidence concerning the

27  prosecutor's exercise of peremptory challenges at the defendant's trial.  To

28  establish such a case, the defendant first must show that he is a member of a

cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." Id. (quoting Batson, 476 U.S. at 96).[18] "Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." Id. (quoting Batson, 476 U.S. at 96); see also Crittenden v. Ayers, 624 F.3d 943, 946 (9th Cir. 2010) (prima facie case requires showing that prospective juror is member of cognizable racial group, that prosecutor used peremptory strike to remove juror, and that totality of circumstances raises inference that strike was on account of race); Boyd v. Newland, 467 F.3d 1139, 1143 (9th Cir. 2006) (as amended) (same), cert. denied, 550 U.S. 933 (2007). Once a prosecutor has offered a race-neutral explanation for a peremptory challenge and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot. Hernandez v. New York, 500 U.S. 352, 359 (1991).

In this case, the trial court found that petitioner's counsel established an inference of discrimination at step one of the Batson framework sufficient to call for further inquiry. (Lodged Doc. 2A at 295-96.) As noted above, counsel argued that the prosecutor had used two peremptory challenges to remove from the venire African American jurors (where petitioner himself was African American), and the

---

[18]But see Powers v. Ohio, 499 U.S. 400, 402 (1991) (holding that "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same races"); see also Tolbert v. Page, 182 F.3d 677, 680 n.4 (9th Cir. 1999) (en banc) (noting that the Powers court "further liberalized Batson and abolished the requirement that the defendant and the stricken juror share the same race").

given second factor that those who are of a mind to discriminate may discriminate in exercising challenges. (Lodged Doc. 2A at 294-95). The prosecution had exercised nine peremptory challenges when petitioner's counsel proffered that two of those challenges had been used to strike African American jurors. (Lodged Doc. 2A at 137, 167-68, 267, 292-95). It appears that at the time the motion was made at least two African American jurors remained on the panel (*i.e.*, Juror TJ7 seated as Juror No. 7 and one other unspecified juror). (Lodged Doc. 2A at 297; RT 808-09). The jury that ultimately served included three African American jurors (*i.e.*, two regular jurors and one alternate juror). (RT 808-09).

### 4.    The Prosecution's <u>Batson</u> Step Two Showing

At step two of the <u>Batson</u> analysis, the prosecutor must give a clear and reasonably specific explanation of his or her legitimate reasons for exercising a challenge – reasons that must be related to the particular case being tried. <u>Purkett v. Elem</u>, 514 U.S. at 768-69 (citations and internal quotation marks omitted). A "legitimate reason" need not be a reason that makes sense, is persuasive, or is even plausible. <u>Id.</u> It must, however, be a reason that does not deny equal protection. <u>Id.</u> at 769. The issue is the facial validity of the explanation. <u>Id.</u> at 768 (citation omitted). At this second step, the reason offered will be deemed race neutral "[u]nless a discriminatory intent is inherent in the prosecutor's explanation." <u>Id.</u> (citation omitted); see also <u>Rice v. Collins</u>, 546 U.S. 333, 338 (2006) (so long as reason offered is not inherently discriminatory, it suffices at step two of the analysis). Any determination about the credibility of the explanation is reserved for the third step of the analysis. <u>Purkett v. Elem</u>, 514 U.S. at 768. Steps two and three are independent inquiries that may not be collapsed into one. <u>Id.</u>

Here, the prosecutor told the trial court that she had excused Juror E.H. for having a tattoo and a father who had been in prison, and she excused Juror P.B. for his apparent difficulty with the concept of circumstantial evidence. The trial court and the Court of Appeal accepted the prosecutor's explanation for striking these

1   jurors as legitimate, race-neutral reasons to satisfy <u>Batson's</u> step two showing.

2   <u>See</u> Lodged Doc. 2A at 298-99; Lodged Doc. 5 at 20-24.  This was not

3   unreasonable.  <u>See generally</u> <u>Rice v. Collins</u>, 546 U.S. at 339; <u>Purkett v. Elem</u>, 514

4   U.S. at 769; <u>see also</u> <u>United States v. Rutledge</u>, 648 F.3d 555, 560 (7th Cir. 2011)

5   (such "trivial race-neutral criteria as hair length, facial hair, tattoos, or piercings"

6   pass the <u>Batson</u> step two filter; citing <u>Purkett v. Elem</u>, 514 U.S. at 768-69

7   (prosecution's reason for striking juror based on juror's appearance (*i.e.*, long,

8   unkempt hair, mustache and beard) was race neutral; such characteristics are not

9   peculiar to any race)); <u>Cook v. LaMarque</u>, 593 F.3d 810, 820-21 (9th Cir. 2010)

10   (previous negative experience with law enforcement is an acceptable race-neutral

11   reason for striking a potential juror); <u>cf.</u> <u>United States v. Karl</u>, 264 Fed. Appx. 550,

12   552 (9th Cir. 2008) (juror's lack of "capacity to understand the complicated tax

13   prosecution" was legitimate race-neutral reason for striking juror).  The

14   prosecution's reasons for striking the jurors at issue as articulated carry no

15   apparent inherent discriminatory intent and have support in the record.

### 5.   **Batson** Step Three Analysis

17   Step three of the <u>Batson</u> analysis, involves an evaluation of the prosecutor's

18   credibility.  <u>Snyder v. Louisiana</u>, 552 U.S. at 477 (citation omitted).  The decisive

19   question will be whether counsel's race-neutral explanation for a peremptory

20   challenge should be believed.  <u>Hernandez v. New York</u>, 500 U.S. at 365.  "The

21   trial court must not simply accept the proffered reasons at face value; it has a duty

22   to evaluate meaningfully the persuasiveness of the prosecutor's race-neutral

23   explanation to discern whether it is a mere pretext for discrimination."[19]  <u>Williams</u>

24   _____

25        [19]A criminal defendant bears the burden of proving pretext once a race-neutral
26   explanation has been offered.  <u>United States v. Feemster</u>, 98 F.3d 1089, 1091-92 (8th Cir. 1996).
     However, "[a] court need not find all nonracial reasons pretextual in order to find racial
27   discrimination."  <u>Kesser v. Cambra</u>, 465 F.3d 351, 360 (9th Cir. 2006) (en banc).  "If review of
     the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the
28                                                                                    (continued...)

1    <u>v. Rhoades</u>, 354 F.3d 1101, 1108 (9th Cir.) (citations, internal quotation marks,

2    and internal brackets omitted), <u>cert. denied</u>, 543 U.S. 926 (2004).  The trial court

3    must evaluate the record and consider each explanation within the context of the

4    trial as a whole.  <u>Kesser v. Cambra</u>, 465 F.3d at 359.  The court may consider

5    factors such as the prosecutor's demeanor, the reasonableness of the explanation,

6    and the nexus between the explanation and accepted trial strategies.  <u>Miller-El v.</u>

7    <u>Cockrell</u>, 537 U.S. 322, 339-40 (2003); <u>see also</u> <u>Snyder v. Louisiana</u>, 552 U.S. at

8    477 (demeanor of attorney who exercises challenge often will be best evidence of

9    discriminatory intent); <u>Mitleider v. Hall</u>, 391 F.3d 1039, 1047 (9th Cir. 2004) (trial

10   court must evaluate prosecutor's proffered reasons and credibility under totality of

11   relevant facts "using all available tools including its own observations and the

12   assistance of counsel"), <u>cert. denied</u>, 545 U.S. 1143 (2005).[20]

13          The court may also be required to conduct a comparative juror analysis to

14   determine whether the basis upon which a prosecutor challenged a disputed juror

15   is a pretext.  <u>Kesser v. Cambra</u>, 465 F.3d at 360-61; <u>see also</u> <u>Murray v. Schriro</u>,

16   745 F.3d 984, 1005 (9th Cir. 2014) ("a comparative juror analysis is an important

17   means for federal courts to review a trial court's ruling in a <u>Batson</u> challenge";

18   comparative juror analysis is used to review the reasonableness of the factual

19   determinations underlying the state court's decision).  The fact that a prosecutor

20   

21          [19](...continued)

22   reasons may be deemed a pretext for racial discrimination." <u>Id.</u> (citations and internal brackets
     omitted).

23   

24          [20]In a situation in which the prosecutor's race-neutral reason for a peremptory challenge is

25   a juror's demeanor, the trial court must evaluate whether the prosecutor's demeanor belies a
     discriminatory intent, and "whether the juror's demeanor can credibly be said to have exhibited
     the basis for the strike attributed to the juror by the prosecutor."  <u>Snyder v. Louisiana</u>, 552 U.S. at

26   477; <u>see also</u> <u>Thaler v. Haynes</u>, 559 U.S. 43, 48 (2010) (noting that in reviewing explanation for
     peremptory challenge based on a juror's demeanor, the trial court should "take into account,

27   among other things, any observations of the juror that the judge was able to make during voir
     dire").

28

1    accepts other jurors of the same race as the challenged juror on the jury is

2    indicative, albeit not dispositive, of a nondiscriminatory motive.  Turner v.

3    Marshall, 121 F.3d 1248, 1254 (9th Cir. 1997), cert. denied, 522 U.S. 1153 (1998).

4    The court need not make specific findings on all the evidence, beyond ruling on

5    the objection to the challenge.  United States v. Gillam, 167 F.3d 1273, 1278 (9th

6    Cir.), cert. denied, 528 U.S. 900 (1999).

7         Here, the trial court accepted the prosecutor's facially-neutral reasons as

8    permissible and credible.  (Lodged Doc. 2A at 299).  Petitioner argues here as he

9    did on appeal that the prosecutor did not strike other jurors similarly situated to

10   E.H.  Specifically, petitioner argues that the prosecutor kept Juror No. 1 (TJ1)

11   whose son had been arrested (Lodged Doc. 2A at 148-49), Juror No. 6 (TJ6)

12   whose father-in-law had been arrested for driving under the influence (Lodged

13   Doc. 2A at 271-72), Juror No. 12 (TJ12) whose brother was arrested a few times

14   for driving under the influence (Lodged Doc. 2A at 325-26), and the prosecutor

15   "forgot" to strike Juror No. 8  (S.S.) who had been arrested previously (Lodged

16   Doc. 2A at 268-69).  Petitioner argues for that the prosecutor simply manufactured

17   a reason to excuse P.B., without indicating whether any similarly situated jurors

18   were allowed to remain.  (Traverse at 29-30).  As discussed in note 17, supra, the

19   prosecutor struck Juror No. 8 (S.S.) when given the opportunity.  (Lodged Doc.

20   2A at 342).

21        The Court of Appeal rejected petitioner's argument, concluding that

22   petitioner had not shown that the prosecution's reasons for rejecting the jurors at

23   issue were pretextual.  (Lodged Doc. 5 at 21-24).  The Court of Appeal explained:

24        [T]he prosecutor explained that it was not solely the incarceration of

25        E.H.'s father, but also the presence of E.H.'s tattoo, that convinced

26        her to challenge E.H.  The other jurors who had family members with

27        an arrest history did not possess that additional factor [i.e., the

28        presence of a tattoo].  It is also significant that a fourth juror – juror

30

1      no. 7, who was Black – had a family member with an arrest history.

2      Specifically, her husband had been arrested over 20 years earlier.

3      The prosecutor did not challenge juror no. 7, despite her race and her

4      husband's arrest history.  That fact undermines any inference that the

5      prosecutor was using the arrest history of Black prospective jurors'

6      family members as a pretext for challenging them based on racial

7      animus.

8  (Lodged Doc. 5 at 22 (citation omitted)).  For P.B., the Court of Appeal found that

9  P.B. invited the prosecutor's dialogue by grimacing, gave the prosecutor a reason

10  to continue her dialogue with P.B. after the first questions by his answers, and

11  P.B.'s apparent skepticism toward circumstantial evidence and his insistence on

12  corroborating facts could reasonably have led the prosecutor to believe that he

13  would be more likely to favor a defense verdict than other jurors.  (Lodged Doc. 5

14  at 23-24).  This was not unreasonable.

15      The credibility of a prosecutor's race-neutral explanations for striking a

16  potential juror "can be measured by, among other factors, the prosecutor's

17  demeanor; by how reasonable, or how improbable, the explanations are; and by

18  whether the proffered rationale has some basis in accepted trial strategy."  Miller-

19  El v. Cockrell, 537 U.S. at 339; see also Cook v. LaMarque, 593 F.3d at 831-32

20  (discussing same).  There is no indication in the record that the trial court did not

21  properly evaluate credibility of the prosecution's reasons for striking the jurors at

22  issue considering these factors, and the Court of Appeal's deference to the trial

23  court's credibility finding was appropriate.  Miller-El v. Cockrell, 537 U.S. at 339

24  ("Deference [to the trial court] is necessary because a reviewing court, which

25  analyzes only the transcripts from voir dire, is not as well positioned as the trial

26  court to make credibility determinations."); see also Felkner v. Jackson, 562 U.S.

27  594, 131 S. Ct. 1305, 1307 (2011) (per curiam) (where trial court credited

28  prosecution's race-neutral explanations and the California Court of Appeal

reviewed the record at length in upholding trial court's findings, state appellate court's decision "was plainly not unreasonable" under AEDPA; AEDPA's "highly deferential standard for evaluating state-court rulings" "demands that state-court decisions be given the benefit of the doubt") (citations omitted).

This conclusion is bolstered by the Court of Appeal's comparative juror analysis of the two stricken jurors to those jurors who were questioned, which accurately reflects the voir dire proceedings.  The Court of Appeal reviewed the record at length in upholding the trial court's findings.  (Lodged Doc. 5 at 12-24). As the Court of Appeal found, it appears that none of the jurors who were questioned and allowed to remain on the jury panel and ultimately served as petitioner's jurors had been arrested or reported negative encounters by family members with law enforcement <u>and</u> had visible tattoos during voir dire (as Juror E.H. had).  <u>See</u> Lodged Doc. 5 at 22; <u>see also</u> Lodged Doc. 2A at 148-49, 153, 158, 168 (Juror No. 1 (TJ1) reporting that her son had been arrested two years before, but no indication of the juror having any tattoos); Lodged Doc. 2A at 60-61, 109 (Juror No. 2 (TJ2) reporting no self or family arrests and no indication of the juror having any tattoos); Lodged Doc. 2A at 144-45, 154-55, 168, 292 (same for Juror No. 3 (TJ3)); Lodged Doc. 2A at 63-64, 123 (same for Juror No. 4 (TJ4)); Lodged Doc. 2A at 268 (same for Juror No. 5 (TJ5)); Lodged Doc. 2A at 271-72, 293 (Juror No. 6 (TJ6) reporting that her father-in-law had been arrested for driving under the influence, but no indication of the juror having any tattoos); Lodged Doc. 2A at 81-82, 111, 120-21, 123, 135-36 (Juror No. 7 (TJ7, who notedly was African American, reporting that her husband had been arrested over 20 years earlier but having no issues with it, and no indication in the record that the juror had any tattoos); Lodged Doc. 2A at 318, 329, 342, 356 (Juror No. 8

///

///

///

32

1   (TJ8) reporting no self or family arrests and no indication of the juror having any

2   tattoos);[21] Lodged Doc. 2A at 308, 317, 341-42 (same for Juror No. 9 (TJ9));

3   Lodged Doc. 2A at 85-87, 100, 135 (same for Juror No. 10 (TJ10)); Lodged Doc.

4   2A at 218-21, 267 (same for Juror No. 11 (TJ11)); Lodged Doc. 2A at 325-26, 343

5   (Juror No. 12 (TJ12) reporting that her brother had been arrested a few times for

6   driving under the influence, but no indication of the juror having any tattoos);

7   Lodged Doc. 2A at 350, 357-60, 369 (Alternate Juror No. 1 (TA1) reporting no

8   self or family arrests and no indication of the juror having any tattoos); Lodged

9   Doc. 2A at 348-49, 362, 365-66, 369 (same for Alternate Juror No. 2 (TA2));

10  Lodged Doc. 2A at 349-50, 362, 369 (same for Alternate Juror No. 3 (TA3)).

11      While the Court might not lump the two reasons given for striking Juror

12  E.H. together in evaluating the prosecutor's credibility as the Court of Appeal did,

13  especially given the prosecutor's statement at the time of the Batson motion that

14  she intended to strike all jurors whose family members had been arrested recently

15  or had negative encounters with law enforcement (Lodged Doc. 2A at 296-97),

16  under the Court's highly deferential standard of review the Court cannot say that

17  the Court of Appeal's decision, which "carefully reviewed the record at some

18  length" in light of the prosecutor's reasons as a whole, was unreasonable so as to

19  merit federal habeas relief.  Felkner v. Jackson, 131 S. Ct. at 1307; Briggs v.

20  Grounds, 682 F.3d 1165, 1170 (9th Cir. 2012) (federal habeas review is "doubly

21  deferential," i.e., "unless the state appellate court was objectively unreasonable in

22  concluding that a trial court's credibility determination was supported by

23  substantial evidence, we must uphold it"), cert. denied, 133 S. Ct. 894 (2013).

24  There is no clearly established federal law specifying the form of the comparative

25  juror analysis the Court must undertake in determining whether a prosecutor's

26  _____

27      [21]But see RT 808 (defense counsel noting for the record during trial that Juror No. 8 had a
    tattoo on the back of his neck which the prosecutor claims was not visible during voir dire
28  because Juror No. 8 had been wearing a collared shirt).

proffered reasons for striking a potential juror are pretext for purposeful discrimination.  See Miller-El v. Dretke, 545 U.S. at 241-47 (generally discussing comparative juror analysis).

It also appears that none of the jurors permitted to serve expressed difficulty with the concept of circumstantial evidence (as Juror P.B. had).  See Lodged Doc. 2A at 60-61, 63-64, 81-82, 85-87, 100, 109, 111, 120-21, 123, 135-36, 144-45, 148-49, 153-55, 158, 168, 218-21, 267-68, 271-72, 292-93, 308, 317-18, 325-26, 329, 341-43, 348-50, 356-60, 362, 365-66, 369 (voir dire of the seated jurors).

Second, consistent with the prosecution's reasons for striking the jurors at issue, the prosecution exercised its peremptory challenges to excuse other unchallenged jurors for similar reasons.  For example, the prosecution struck Juror No. 6 (A.G.) because she said she could not be fair and thought her father was treated unfairly when he was sent to prison in 2005.  (Lodged Doc. 2A at 68-70, 134-35, 137).[22]  The prosecutor struck Juror No. 6 (B.K.) whose husband had been arrested and convicted of driving under the influence and said she may have an issue if police witnesses "come off with an attitude."  (Lodged Doc. 2A at 225-28, 266-67).  The prosecutor struck Juror No. 6 (W.A.) whose brother was in prison 40 years ago.  (Lodged Doc. 2A at 216-18, 267).  The prosecutor struck Juror No. 8 (S.S.) who had prior arrests.  (Lodged Doc. 2A at 268-69, 293, 342).  The prosecutor struck Juror No. 9 (M.M.) who had been arrested for assault.  (Lodged Doc. 2A at 82-84, 135, 293).  The prosecutor struck Juror No. 9 (B.S.) who had been arrested for reckless driving and assault with a deadly weapon.  (Lodged Doc. 2A at 274-75, 300).  The prosecutor struck Juror No. 11 (D.R.) who reported that several family members had been convicted of crimes.  (Lodged Doc. 2A at 77-80, 167).  The prosecutor struck Juror No. 13 (G.H.) whose daughter had two

[22]The trial court had denied the prosecution's challenge for cause indicating that on further questioning Juror No. 6 said she could be fair and follow the court's instructions. (Lodged Doc. 2A at 135).

arrests or convictions for driving under the influence for which she did jail time. (Lodged Doc. 2A at 348, 369).  For these jurors, either there was a direct negative encounter that the juror had with law enforcement because the juror was arrested, or the family member's encounter with law enforcement led to a conviction.[23]  The Court "need not strain to see the potential bias inhering in such a situation."  Murray v. Schriro, 745 F.3d at 1008.  In contrast, the prosecutor did not strike Juror No. 1 (TJ1) whose son had been arrested, where Juror No. 1 said that she was angry with her son for being arrested, but not law enforcement.  (Lodged Doc. 2A at 149).  Nor did the prosecutor strike Juror Nos. 6 and 12 whose family members had been arrested for driving under the influence but reported that the family members were treated fairly.  (Lodged Doc. 2A at 272, 326).  The Court cannot conclude from the prosecutor's decision to keep these jurors vis-a-vis Juror E.H. (whose father was not just arrested but convicted) proves a racial motivation for the prosecution's exercise of her peremptory challenges.  Murray v. Schriro, 745 F.3d at 1010.  Finally, similar to the reason the prosecutor struck Juror. P.B., the prosecutor also struck Juror No. 10 (D.M.), because Juror No. 10 said he could not pass judgment – i.e., if he was not personally a witness to a crime, he would not be able to say if the person being tried was guilty or not guilty.  (Lodged Doc. 2A at 76).

Third, as the trial court noted, the empaneled jury included two African American jurors and one of the alternate jurors was African American.  (RT 808-09).  This is indicative of a nondiscriminatory motive.  Turner v. Marshall, 121 F.3d at 1254.

///

---

[23]The prosecutor also struck Juror No. 6 (S.V.) whose uncle had been arrested the year before but reportedly was treated fairly.  (Lodged Doc. 2A at 224, 267, 293).  There is no indication in the record whether Juror No. 6 had any tattoos or other race-neutral traits that may have influenced the prosecutor's decision to strike this juror.

1    Because the prosecution's reasons for striking the jurors at issue shared a

2    logical nexus to the prosecution's concerns in getting the most favorable jury for

3    the prosecution, and because petitioner has not shown that the prosecution's

4    reasons were pretextual and nothing in the record otherwise suggests that the

5    prosecutor accepted other jurors with the same traits as the excused jurors, the

6    state court findings that petitioner has not shown purposeful discrimination at step

7    three was not unreasonable.  Compare United State v. Alvarez-Ulloa, 784 F.3d at

8    567 ("where the statistical evidence is not overwhelming and a comparative

9    analysis is unhelpful," defendant did not meet burden in showing purposeful

10   discrimination).

11                **6.    Conclusion**

12        For the foregoing reasons, petitioner is not entitled to habeas relief on his

13   Batson claim.  Petitioner has failed to demonstrate that the prosecutor's challenges

14   were racially motivated.  Purkett v. Elem, 514 U.S. 768.   The Court of Appeal's

15   rejection of petitioner's Batson claim was not contrary to, or an unreasonable

16   application of, clearly established federal law.  Nor was it based on an

17   unreasonable determination of the facts in light of the evidence presented.

18   **C.    Petitioner's Sufficiency of the Evidence Claim Does Not Merit**

19         **Habeas Relief**

20        In Ground Five, petitioner contends that there was insufficient evidence to

21   support the jury's true finding on the gang enhancement allegations for the

22   Sweeney Drive counts.  (Petition, Ground Five; Traverse at 30).  Specifically,

23   petitioner argues that there was no evidence beyond the gang expert's testimony to

24   support a true finding on such gang enhancement allegations, and that the expert's

25   opinion – which was nothing more than speculation – was insufficient to support

26   such a finding.  (Traverse at 30).  The California Court of Appeal denied this

27   claim, finding sufficient evidence to support the gang enhancements.  (Lodged

28   Doc. 5 at 28-32).  Petitioner is not entitled to federal habeas relief on this claim.

1          **1.    Applicable Law**

2          On habeas corpus, the court's inquiry into the sufficiency of evidence is

3    limited in that it is subject to two layers of judicial deference.  <u>Coleman v.</u>

4    <u>Johnson</u>, 132 S.Ct. 2060, 2062 (2012) (per curiam).  First, on direct appeal, "it is

5    the responsibility of the jury – not the court – to decide what conclusions should

6    be drawn from evidence admitted at trial.  A reviewing court may set aside the

7    jury's verdict on the ground of insufficient evidence only if no rational trier of fact

8    could have agreed with the jury."  <u>Id.</u> (quoting <u>Cavazos v. Smith</u>, 132 S.Ct. 2, 4

9    (2011) (per curiam)); <u>see</u> <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (standard

10   of review on sufficiency of the evidence claim is whether, "after viewing the

11   evidence in the light most favorable to the prosecution, *any* rational trier of fact

12   could have found the essential elements of the crime beyond a reasonable doubt")

13   (emphasis in original).  "[T]he only question under Jackson is whether [the jury's]

14   finding was so insupportable as to fall below the threshold of bare rationality."

15   <u>Coleman</u>, 132 S.Ct. at 2065.

16         Second, on habeas review, "a federal court may not overturn a state court

17   decision rejecting a sufficiency of the evidence challenge simply because the

18   federal court disagrees with the state court.  The federal court instead may do so

19   only if the state court decision was 'objectively unreasonable.'"  <u>Coleman</u>, 132

20   S.Ct. at 2062, 2065 (citations omitted); <u>see</u> <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274-

21   75 (9th Cir. 2005) (as amended) (on federal habeas review, relief may be afforded

22   on sufficiency of the evidence claim only if the state court unreasonably applied

23   <u>Jackson</u> to the facts of the case), <u>cert. denied</u>, 546 U.S. 1137 (2006).[24]

24         Sufficiency of the evidence claims are judged by the elements defined by

25   state law.  <u>Jackson</u>, 443 U.S. at 324 n.16.  Imposition of a gang enhancement

26   _____

27         [24]The California standard for determining the sufficiency of evidence to support a
     conviction is identical to the federal standard enunciated by the United States Supreme Court in

28   <u>Jackson</u>.  <u>People v. Johnson</u>, 26 Cal.3d 557, 576 (1980).

1  under California Penal code section 186.22(b)(1) – which is in issue here –

2  requires proof that the defendant (1) committed a felony for the benefit of, at the

3  direction of, or in association with a criminal street gang; and (2) committed the

4  crime with the specific intent to promote, further, or assist in any criminal conduct

5  by gang members.  Emery v. Clark, 643 F.3d 1210, 1214 (9th Cir. 2011) (per

6  curiam); Cal. Penal Code § 186.22(b)(1).

7      California courts routinely have held that the prosecution may rely solely on

8  expert testimony to prove the elements of the state's criminal street gang

9  sentencing enhancement.  See People v. Hernandez, 33 Cal. 4th 1040, 1047-48

10 (2004) (citing People v. Gardeley, 14 Cal. 4th 605, 617-20 (1997), cert. denied,

11 522 U.S. 854 (1997)); see also People v. Albillar, 51 Cal. 4th 47, 63 (2010) (expert

12 opinion that criminal conduct benefitted gang by enhancing the gang's reputation

13 for viciousness sufficient to show conduct committed for the benefit of a criminal

14 street gang); People v. Ortega, 145 Cal. App. 4th 1344, 1356 (2006) (finding gang

15 expert's testimony sufficient to establish that gang was criminal street gang).

16 Additionally, on reviewing the sufficiency of the evidence, the testimony of a

17 single witness is sufficient to uphold a conviction.  Bruce v. Terhune, 376 F.3d

18 950, 957-58 (9th Cir. 2004) (per curiam).  With these principles in mind, the Court

19 turns to each element of the gang enhancement as applied in petitioner's case.

20      **2.    Sufficient Evidence Supports the Finding That the Sex Cash**

21      **Gang Is a Criminal Street Gang Element**

22      Petitioner does not challenge the sufficiency of the evidence to establish

23 that the Sex Cash gang is a criminal street gang.  To establish that Sex Cash is a

24 criminal street gang, the prosecution had to prove (1) the group is an ongoing

25 association of three or more persons sharing a common name, identifying sign, or

26 symbol; (2) one of the group's primary activities is the commission of one or more

27 statutorily enumerated criminal offenses (including burglary); and (3) the group's

28 members must engage in, or have engaged in, a pattern of criminal gang activity.

See People v. Duran, 97 Cal. App. 4th 1448, 1457 (2002); Cal. Penal Code § 186.22(e)(11), (f). A "pattern of criminal gang activity" is "the commission of, attempted commission of, . . . or solicitation of, . . . two or more" enumerated predicate offenses "committed on separate occasions, or by two or more persons on the same occasion." Cal. Penal Code § 186.22(e); People v. Loeun, 17 Cal. 4th 1, 9 (1997), cert. denied, 523 U.S. 1129 (1998).

Here, the gang expert testified that he first began hearing about the Sex Cash gang in 2001 when he was assigned to the Moreno Valley High School as a resource officer. (RT 1263). Sex Cash was vying for turf and recruiting at the high school, sometimes by use of force, along with the Edgemont Criminal gang, Dorner Blocc, Cali Clowns, and Cali Franchise. (RT 1264-67; but see RT 1285 (expert testifying that Cali Clowns was a dance group and not a criminal street gang)). As of October 2004, there were 30 to 40 Sex Cash members, who identified by wearing large baggy t-shirts, clothing with dollar signs, and the color green for money. (RT 1266, 1269-70, 1286-87). Their primary activity was committing burglaries, but they also committed robberies, assaults with a deadly weapon, and sold drugs. (RT 1287). As examples, the expert testified about two active Sex Cash gang members in 2004 who committed specific burglaries. (RT 1283-84, 1293-96). The expert's testimony was sufficient to establish that Sex Cash was a criminal street gang. See People v. Hernandez, 33 Cal. 4th at 1047-48; People v. Gardeley, 14 Cal.4th at 619-20; People v. Ortega, 145 Cal. App. 4th at 1356; see also People v. Sengpadychith, 26 Cal.4th 316, 324 (2001) (sufficient proof of gang's primary activities may consist of expert testimony).

> **3.    Sufficient Evidence Supports the Finding That the Crimes Were Committed for the Benefit of, at the Direction of, or in Association with the Sex Cash Gang**

When a defendant is charged with a gang enhancement under section 186.22(b)(1), as here, the prosecution is not required to show that the defendant is

1    an active or current gang member of the criminal street gang that allegedly

2    benefits from his crime.  People v. Bragg, 161 Cal. App. 4th 1385, 1402 (2008).

3    Section 186.22(b)(1) only mandates that the crime charged be "gang-related."  See

4    People v. Rodriguez, 55 Cal. 4th 1125, 1138 (2012); People v. Livingston, 53 Cal.

5    4th 1145, 1170 (2012) (quoting People v. Gardeley, 14 Cal. 4th at 622).[25]

6           To establish that a crime was gang-related, the prosecution had to show that

7    the crime occurred under one of three possible circumstances:  (1) "in association

8    with" a criminal street gang; (2) "at the direction of" a criminal street gang; or

9    (3) "for the benefit of" a criminal street gang.  See Cal. Penal Code § 186.22(b)(1);

10   see also People v. Albillar, 51 Cal.4th at 60 (describing the crimes as "gang related

11   in two ways: they were committed in association with the gang, and they were

12   committed for the benefit of the gang").

13          Here, as the Court of Appeal found, the non-expert evidence coupled with

14   the gang expert's testimony was sufficient to prove that the shootings were

15   committed for the benefit of the Sex Cash gang:

16          The jury heard evidence that the Sex Cash gang was active in

17          Moreno Valley High School and in the surrounding area, including

18          Sweeney Drive, which it claimed as part of its turf.  [Petitioner] and

19          Adams were associates of Sex Cash.  At the time, Sex Cash was

20          competing for dominance with the Edgemont Criminal Gang and

21          Dorner Blocc, which were allied together against Sex Cash.

22   ///

23

24          [25]In contrast, to impose a gang enhancement under section 186.22(a), the prosecution
     must prove that the defendant "actively participates in a criminal street gang."  Cal. Penal Code
25   § 186.22(a); see also People v. Rodriguez, 55 Cal.4th at 1138 ("Section 186.22(a) and section
     186.22(b) strike at different things.  The enhancement under section 186.22(b)(1) punishes gang-
26   related conduct. . . with section 186.22(a), the Legislature sought to punish gang members who
27   acted in concert with other gang members in committing a felony regardless of whether such
     felony was gang-related.") (emphasis original; citations omitted).
28

Colmer explained that one way gangs increase their membership is for someone to be "jumped in," which is a process in which the prospective member is beaten up and intimidated every day until he agrees to join the gang. The evidence at trial was that the Sex Cash gang was attempting to intimidate the victims of the Sweeney Drive shooting, namely Anthony M. and Lee, to join the Sex Cash gang, and that Sex Cash was also intimidating their friend, Eric Young, who lived at the Sweeney Drive house. All three boys were being harassed by Sex Cash at school and chased home. Lee told police that Adams and [petitioner] were trying to get him to join the Sex Cash gang, and Anthony M. similarly reported being harassed to join the gang. Further, Colmer testified that Young was associated with the Edgemont Criminal Gang and Dorner Blocc, and that Anthony M. was associated with Dorner Blocc. Pops reported that members of Sex Cash often congregated at a house across the street, and on the morning of the shooting, he heard a member of Sex Cash outside yelling, "Sex Cash click, bring it on out," which he thought was directed at his children. Colmer explained that (1) associates of the gang – such as [petitioner] and Adams – can commit crimes on behalf of a gang, (2) those crimes could be committed for the benefit of the gang without a gang member present, and (3) one way an associate can show allegiance to the gang or willingness to be a member is to commit crimes for the benefit of the gang.

Based on this evidence, a reasonable jury could have concluded that [petitioner] and Adams, as associates of the Sex Cash gang, committed the Sweeney Drive shooting as part of the gang's intimidation campaign against Anthony M., Lee and Eric Young, and also generally show Sex Cash's dominance in the neighborhood at the

1   time of a turf war between it and its two rival gangs, with whom two

2   of the victims were associated.

3   (Lodged Doc. 5 at 31-32).  This was not unreasonable.

4       The evidence included testimony from Anthony M., Lee, and Pops that:

5   (1) the Sex Cash gang was harassing Anthony M., Lee, and Young to get them to

6   join the gang (RT 216, 343, 346, 525, 573, 642, 712-15, 903-09, 913-14, 924,

7   1168; CT 1196-97); (2) members or associates of the gang congregated across the

8   street from where the Sweeney Drive shooting occurred (RT 222, 292, 710-11,

9   1167-68); and (3) on the morning of the shooting Pops heard a member of Sex

10  Cash yell "this is Sex Cash click, bring it out" (RT 881, 1170).  This testimony,

11  along with the expert's testimony that one way gangs increase their membership

12  (and in turn become stronger) is by intimidating prospective members until they

13  agree to join (RT 1266-68), was sufficient for a reasonable jury to conclude that

14  the Sweeney Drive shooting was committed to benefit the gang.

15      There was also sufficient evidence upon which the jury could have found

16  that petitioner and Adams, as associates of the gang, committed the Sweeney

17  Drive shooting to benefit the gang.  The expert testified that Adams was an

18  associate of the Sex Cash gang based on Adams's repeated contact with others

19  known to be Sex Cash members.  (RT 1298-1302, 1353-58, 1369-72).  The expert

20  opined that petitioner was an associate of the Sex Cash gang based on his alleged

21  participation in the Pattilynn Drive shootings which were done with at least two

22  others the expert thought were associates, within the Sex Cash gang's turf, against

23  a Cali Clown member.  (RT 1298-99).[26]  The expert explained that associates of

24  _____

25      [26]At the time of the shootings, Jacob Rogers (who was present at the Pattilynn Drive
    shooting) self-admitted to being a member of the Sex Cash gang with the moniker of Baby Non

26  Stop.  (RT 1296-97).  Keymonnie Rander and Spencer Beeks, who were also present at the
    Pattilynn Drive shooting, were active, validated Sex Cash members at the time of the shooting.

27  (RT 1302-05).  The expert thought that the shootings were committed against rivals or "victims

28                                                                                          (continued...)

gangs commit drive-by shootings with others to prove the crime actually occurred, to show their allegiance to a gang, and willingness to participate in criminal activity with other gang members.  (RT 1288).  Respect in gang culture is based on fear, intimidation, and the level of work (or crime) a person is willing to put in for a gang.  (RT 1289).

On this record, the Court cannot conclude that the Court of Appeal's findings constitute unreasonable determinations of the facts or that its analysis is objectively unreasonable.

### 4. Sufficient Evidence Supports the Finding That Petitioner Acted with Specific Intent to Promote, Further, or Assist in Criminal Conduct by Gang Members

"[T]he scienter requirement in section 186.22(b)(1) – *i.e.*, 'the specific intent to promote, further, or assist in any criminal conduct by gang members' – is unambiguous and applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced."  People v. Albillar, 51 Cal. 4th at 66 (emphasis in original); see also Emery v. Clark, 643 F.3d at 1215-16 (recognizing that California state courts have held that "evidence that the defendant had the specific intent to help a gang member commit the charged crime is enough to justify application of the enhancement" and applying California Supreme Court's "authoritative interpretation of section 186.22(b)(1)" in Albillar).  Nonetheless, the prosecution is not required to prove what specific crime(s) the defendant intended to promote.  Albillar, 51 Cal. 4th at 66; In re Cesar V., 192 Cal. App. 4th 989, 1000 (2011).  Nor is it required "that the defendant act with the specific intent to promote, further, or assist a *gang*; the statute requires only the specific intent to

_____

(...continued)
groups" because Young was a member of Cali Clowns and Anthony was affiliated in some way with Dorner Blocc.  (RT 1298).

1  promote, further, or assist criminal conduct by *gang members*."  Albillar, 51

2  Cal.4th at 67 (emphasis in original).

3        Here, there was sufficient evidence on which the jury could have found that

4  petitioner harbored the requisite intent to promote, further, or assist in criminal

5  conduct by the Sex Cash gang.  The jury heard evidence that petitioner and Adams

6  were at least associates of the Sex Cash gang.  As noted above, the expert opined

7  that petitioner and Adams were associates of the Sex Cash gang based on their

8  conduct with other gang members.  All of the eyewitnesses who testified at trial

9  were reluctant to indicate whether the defendants were gang members.  Anthony

10 M. denied knowing whether petitioner or Adams were members of the Sex Cash

11 gang.  (RT 343, 346).  However, the trial court admitted Anthony's prior grand

12 jury testimony in which Anthony admitted that petitioner, Adams, and Jefferson

13 were all members of the Sex Cash gang.  (CT 1196-98).

14       From this testimony, a reasonable jury could have inferred that petitioner,

15 Adams, and Jefferson, were Sex Cash members who acted in concert in

16 committing the Sweeney Drive shooting for the jury to find that petitioner

17 committed the shooting with the specific intent to promote, further, or assist in

18 criminal conduct by gang members.  Commission of a crime in concert with

19 known gang members constitutes substantial evidence that a defendant acted with

20 the requisite specific intent. See Albillar, 51 Cal.4th at 68 ("if substantial evidence

21 establishes that the defendant intended to and did commit the charged felony with

22 known members of a gang, the jury may fairly infer that the defendant had the

23 specific intent to promote, further, or assist criminal conduct by those gang

24 members."); see also Emery, 643 F.3d at 1216 (holding that the evidence sufficed

25 to prove that the petitioner committed the charged crimes with the "specific intent"

26 to assist in criminal conduct by gang members where it showed that the petitioner

27 and his accomplice were fellow gang members); People v. Leon, 161 Cal. App.

28 4th 149, 162, 170 (2008) ("[T]here was evidence that [the defendant] intended to

44

1  commit. . . the offenses in association with Rodriguez, and that he knew

2  Rodriguez was a member of his gang.  From this evidence, the jury could

3  reasonably infer that [the defendant] harbored the 'specific intent to promote,

4  further, or assist in any criminal conduct by gang members.'").

5      The expert's opinion that petitioner's offenses were committed for the

6  benefit of the Sex Cash gang provided additional support for this inference.  Cf.

7  Emery, 643 F.3d at 1216 (evidence that the petitioner committed the crime with a

8  fellow gang member coupled with expert testimony identifying a probable gang

9  related motivation for the crime was sufficient to show specific intent).  The expert

10  testified that shootings benefit of the Sex Cash gang by showing the gang's ability

11  to control its turf through violence against others vying for control (namely

12  members of Cali Clowns which was aligned with the Edgemont Criminals), and

13  building the gang's reputation as a violent criminal street gang by instilling fear in

14  the community, which would help the gang recruit members and become stronger.

15  (RT 1309-13, 1332-39, 1364).

16      On this record, the Court of Appeal correctly determined that there was

17  sufficient evidence from which a rational trier of fact could conclude that

18  petitioner participated in the Sweeney Drive shooting with the specific intent to

19  benefit the Sex Cash gang.

20              **5.    Conclusion**

21      For the foregoing reasons, the Court of Appeal's rejection of petitioner's

22  challenge to the sufficiency of the evidence to support the jury's true findings on

23  the gang enhancement allegations was neither contrary to, nor an unreasonable

24  application of, clearly established federal law and was not based on an

25  unreasonable determination of the facts in light of the evidence presented.

26  Accordingly, petitioner is not entitled to federal habeas relief on Ground Five.

27  ///

28  ///

## VI.   RECOMMENDATION

IT IS THEREFORE RECOMMENDED that the District Judge issue an Order:  (1) approving and accepting this Report and Recommendation, including the Magistrate Judge's October 2013 Order which has been attached and incorporated herein by reference (see supra note 2); (2) denying the Stay Request (see supra note 2); (3) denying the Petition and dismissing this action with prejudice; and (4) directing that judgment be entered accordingly.[27]

DATED:  July 31, 2015

_____ /s/

Honorable Jacqueline Chooljian
UNITED STATES MAGISTRATE JUDGE

---

[27]Petitioner's request for an evidentiary hearing (Traverse at 21) should be denied because he has not alleged any material fact which he did not have a full and fair opportunity to develop in state court and which, if proved, would show his entitlement to habeas relief.  See Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011) (scope of record for 28 U.S.C. § 2254(d)(1) inquiry limited to record that was before state court that adjudicated claim on the merits); Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (if record refutes applicant's factual allegations or otherwise precludes habeas relief, court not required to hold evidentiary hearing); Gandarela v. Johnson, 286 F.3d 1080, 1087 (9th Cir. 2002) (evidentiary hearing properly denied where the petitioner "failed to show what more an evidentiary hearing might reveal of material import"), cert. denied, 537 U.S. 1117 (2003).